## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JUDITH R. WALKER, | ) | CASE NO. 4:05CV3059 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER of the SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of Plaintiff Judith R. Walker's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*  The Court has carefully considered the record and the parties' briefs.

### PROCEDURAL BACKGROUND

The Plaintiff, Judith R. Walker ("Walker"), filed her initial applications for Disability and SSI benefits on February 28, 2003.  (Tr. 15, 70-73, 314-17).  The claims were denied initially (Tr. 15, 319-23) and on reconsideration (Tr. 326-30).  An administrative hearing was held before Administrative Law Judge Theodore T. Gotsch ("ALJ") on July 20, 2004.  (Tr. 15, 331-373).  On August 25, 2004, the ALJ issued a decision finding that Walker was not "disabled" within the meaning of the Act and therefore not eligible for either disability or SSI benefits.  (Tr. 15-24).  On January 8, 2005, the Appeals Council of the Social Security Administration denied Walker's request for review.  (Tr. 2, 9-10).  Walker now seeks judicial review of the ALJ's determination as the final decision of the Defendant, Jo

Anne B. Barnhart, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1).

Walker claims that the ALJ decision was incorrect because the ALJ failed to: 1) appropriately weigh the opinion of Walker's treating physician, Dr. David Samani; and 2) properly apply *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), when evaluating Walker's credibility.  (Filing No. 10 ("Walker Brief") at 10).  Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Walker is now 43 years old.  (Tr. 15, 70, 373).  She has a high school education. (Tr. 15).  Walker's most recent occupational experience includes custodial work.  (*Id.*). Since February 19, 2003, Walker has not engaged in any substantial gainful employment. (Tr. 16).  She alleges disability due to depression, back pain, swollen feet, knee arthritis, gallbladder problems, incontinence, weight problems, and migraine headaches.  (Tr. 15-16, 76).

### *Walker's Testimony*

At the hearing, Walker testified that prior to alleging disability in February 2003, she had been performing custodial work at the University of Nebraska, Lincoln, for ten years. (Tr. 337).  Walker alleges she was fired because she called in sick too many times due to her illness.  (Tr. 338).  She testified that her custodial duties included: dumping trash, vacuuming, dusting, sweeping, and mopping.  (Tr. 340).  She said she experienced more

2

pain in her knee and foot when she was assigned the additional tasks of buffing floors and carrying buckets up and down stairs in 2002. (Tr. 340-41). Walker has not held any other jobs outside the home in the past fifteen years. ( *Id.*).

She testified that she experiences migraine headaches about three times a week and that she suffers from major depression, which causes her to sit in a room by herself and stare at the wall. (Tr. 346). She is currently taking the following medications: Prozac, Topamax, Nexium and DDAVP. (Tr. 347). Some of these medications make her feel sleepy. (Tr. 352). She testified that she cannot stand for longer than five minutes without her knee or foot swelling and cannot sit for more than five minutes without having to lean forward (Tr. 348, 349-50). She stated that she can walk less than a block and can lift five to ten pounds. (Tr. 351). She is limited in her ability to crouch or squat and climb stairs. (Tr. 352). She is 5'2" and weighs 235 pounds. (Tr. 336). Walker testified that she has been unable to lose weight. (Tr. 362).

Walker stated that she is single with two children, ages six and ten. (Tr. 336, 353). Her sister helps her get the children to school and do household chores. (Tr. 354, 355). She does not interact with many people other than her children and sister because she does not get along well with other people. (Tr. 358-59). Walker testified that her inability to get along with people sometimes caused problems at work with her supervisor and co-workers. (Tr. 359). She said she gets anxiety when she is in crowded places. ( *Id.*). Walker testified that she did not think she could perform any work that required her to be on her feet or a job that would require sitting most of the day due to her knee, foot and back problems. (Tr. 362-63). She said she does not have the patience to sit in an office with other people all day. (Tr. 363).

3

***Vocational Expert's Testimony***

Testimony was also heard from a vocational expert ("VE"), Gail Leonhardt, under contract with the Social Security Administration ("SSA"). (Tr. 68, 366-72). The VE testified that, assuming Walker could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk at least two hours in an eight hour work day, sit about six hours in an eight hour work day, avoid rapid and repetitive motions of the right lower extremity, experience occasional postural limitations, and avoid concentrated exposure to vibrations, avoid working at heights, and assuming that Walker would be moderately limited in the ability to understand and remember and carry out detailed instructions, moderately limited in the ability to interact appropriately with the general public, and moderately limited in the ability to accept instructions and respond appropriately to supervisors' criticisms, Walker could not perform her past relevant work. (Tr. 368-69). Again assuming these limitations, the VE opined that Walker could perform unskilled work in the sedentary category, such as an assembler, a packager, or possibly a security guard, and these positions were available in Nebraska and throughout the United States. (Tr. 370).

However, assuming that Walker's physician was correct that Walker could work only four days a week, the VE opined that the above positions would not be available to her. (Tr. 371). The VE also testified that assuming Walker could only occasionally work at a rapid pace and would frequently need to work at a slow pace, she would not be able to work as a production assembler or hand packager. (Tr. 371-72). The VE further opined that assuming Walker's pain would interfere with her attention and concentration on a frequent basis, that would preclude all work. (Tr. 372).

4

***Documentary Evidence Before the ALJ***

In addition to oral testimony, the ALJ considered numerous pieces of medical evidence.  On April 24, 2002, Walker underwent a laparoscopic cholecystectomy.  (Tr. 131).  The procedure showed a slightly contracted gallbladder with multiple stones and minimal evidence of previous cholecystitis.  (*Id.*).

Walker saw David L. Samani, M.D., on April 22, 2003, for a follow up and evaluation of her patella femoral arthrosis.  (Tr. 202).  She was tender on examination in the entire dorsal aspect of her left foot, plantar aspect of the foot, and the medial and lateral malleoli.  (*Id.*).  She had no instability of the ankle.  (*Id.*).  Dr. Samani noted that Walker may have a stress fracture, and that she was overweight and stood a lot.  ( *Id.*).

An MRI of Walker's left foot on May 5, 2003, showed a stress fracture of the second and fourth metatarsal.  (Tr. 201).  Dr. Samani noted that Walker last worked on February 19, 2003, and most likely would remain off work an additional month. (*Id.*).   He recommended physical therapy to assist her in walking and to alleviate pain.  ( *Id.*).

On May 16, 2003, Walker saw Ruilin Wang, M.D., for a consultative disability physical examination.  (Tr. 158).  Walker complained of multiple joint pain and reported left foot pain since the previous December due to an injury.  (*Id.*).  She also noted a ten year history of depression for which she took Zoloft, migraine headaches two to three times per week, a history of hypertension, and a previous cholecystectomy.  (Tr. 158-59).

On examination, Walker was in no acute distress, but looked fatigued.  (Tr. 159).  There was no muscle atrophy noted.  (Tr. 159-60). Dr. Wang noted tenderness to palpation on the left forefoot with no local deformity or swelling.  (Tr. 160).  Motor strength was 5/5

5

in both lower and upper extremities, and gait was stable and balanced. (*Id.*). Walker was able to stand on her toes and heels, and there was no tenderness or deformity of the lower back (*Id.*). Dr. Wang's impression was chronic joint pain especially in the lower back and both knees; left foot pain with previous injury; depression; migraine headaches; hypertension; stress incontinence; and an episode of diarrhea, etiology uncertain. (*Id.*).

In summary, the doctor noted that a physical examination revealed no significant impairments with mild limited range of motion of both ankles and 1+ edema of both ankles. (Tr. 161). He stated that Walker might need to lose weight and can engage in physical activities as tolerated. (*Id.*).

On June 2, 2003, Dr. Samani gave Walker a CAM walker, and suggested weight loss as a beneficial treatment measure for pain. (Tr. 200).

Walker saw Dr. Brian Boes on June 16, 2003. (Tr. 162). She described a ten year history of headaches. (*Id.*). On examination, Walker was in no apparent distress but appeared somewhat depressed. (Tr. 163). Cranial nerves were intact. (*Id.*). Visual fields were full to confrontation, facial sensation was normal, shoulder shrug was normal, motor strength in the upper and lower extremities was normal, and reflexes were normal. (*Id.*). A sensory examination was intact. (*Id.*). Dr. Boes recommended a CT scan of the head. (*Id.*).

A medical record from Nebraska Internal Medicine dated June 19, 2003, noted that Walker was watching her diet, and her blood pressure was "great." (Tr. 274). She was encouraged to proceed with vocational education. (*Id.*).

A CT scan of Walker's head was taken on June 25, 2003, due to complaints of headaches and dizziness. (Tr. 166). The scan was negative. (*Id.*).

On June 30, 2003, Dr. Samani noted that Walker was still using her CAM walker, but was overall slowly improving. (Tr. 199). She was weight bearing as tolerated, and was told that it would be another month before her stress fracture fully healed. (*Id.*). Walker was then engaged in vocational rehabilitation which was approved by Dr. Samani as long as Walker could elevate her foot for swelling. (*Id.*).

In a note dated July 10, 2003, Dr. Bohart of Nebraska Internal Medicine noted that Walker's headaches had been treated effectively with new medication, but due to migraine triggers, she had to continue her current one-hour restriction to classroom work. (Tr. 269).

On July 28, 2003, Dr. Samani noted that Walker continued to have pain in her left foot. (Tr. 198). X-rays revealed no displacement of the fractures with near complete healing. (*Id.*).

X-rays of Walker's left foot on August 19, 2003, showed mild degenerative changes in the tarsal region, inferior calcaneal spurring, and flattening of the plantar arch. (Tr. 216). There was no definite fracture, dislocation, or periosteal reaction, and no significant erosion changes. (*Id.*).

A triple-phase bone scintigraphy of Walker's left foot on August 25, 2003, was consistent with plantar fasciitis and degenerative changes. (Tr. 221-22).

Physical therapy records dated August 25, 2003, indicated that Walker's chief complaints were bilateral cervical and upper back pain. (Tr. 257). She underwent therapy for two weeks and her pain started to go away. (*Id.*). However, she was struck by

7

someone and her neck pain was then worse.  (*Id.*).  She rated her pain as a 10/10.  (*Id.*).
During the subjective history, Walker seemed very lethargic and was slow to answer all
questions.  (*Id.*).  Cervical range of motion was decreased in all directions.  (*Id.*).  Range of
motion of the upper extremities was with normal limits, as were reflexes.  (*Id.*).  Walker
seemed to be high on the pain scale as far as her subjective threshold, and patients who
reported 10/10 pain typically exaggerate.  (*Id.*).  She was treated with most heat and
electrical stimulation.  (Tr. 258).

In a Work Status Report dated August 27, 2003, Dr. Bohart indicated that Walker
could return to one hour of classroom work and two hours of work time on August 28,
2003.  (Tr. 226). These restrictions were temporary and were to be re-evaluated in two
weeks.  (*Id.*).

A September 4, 2003, bone scan of Walker's left foot showed no evidence of a
stress fracture across the metatarsals.  (Tr. 240).  Physical examination revealed continued
tenderness of the plantar heel, and tenderness along the third, fourth, and fifth metatarsals.
(*Id.*).  Gross alignment was well preserved.  (*Id.*).  Dr. Keith Hughes recommended a
course of physical therapy to teach a home stretching program and consideration of steroid
injection to the plantar heel in four weeks.  (*Id.*).

On October 3, 2003, Dr. Hughes indicated that Walker was currently unable to look
for employment due to left foot pain and recent cortisone injection.  (Tr. 238).  This
restriction was temporary.  (*Id.*).

8

On November 13, 2003, Walker underwent a plantar fascial release/fasciectomy of the left foot, and decompression/release, first branch, lateral plantar nerve of the left foot performed by Dr. Hughes.  (Tr. 231-35).  No complications were noted.  (Tr. 232).

Walker returned to Dr. Samani on January 16, 2004, and reported continued significant right knee pain.  (Tr. 251).  She had completed physical therapy, but was unsuccessful in her attempt to lose weight.  (*Id.*).  Dr. Samani's impression was a possible degenerative tear of the medial lateral meniscus.  (*Id.*).  He recommended an MRI scan.  (*Id.*).

On February 9, 2004, Dr. Samani noted that an MRI of Walker's right knee was significant for a tear of the medial meniscus, small moderate knee joint effusion, and degenerative arthritic changes.  (Tr. 250).  He noted that she might be a candidate for a cortisone injection.  (*Id.*).  Walker returned on February 16, 2004, and her range of motion remained full.  (Tr. 249).  Dr. Samani administered a cortisone injection and recommended that Walker return in one month.  (*Id.*).  On March 29, 2004, Walker reported continued significant pain.  (Tr. 248).

Dr. Bruce Miller performed operative arthroscopy with limited debridement and patella shaving of Walker's right knee on May 11, 2004.  (Tr. 263).  Walker tolerated the procedure well and left the operating room in good condition.  (*Id.*).  On May 28, 2004, Dr. Miller noted that Walker was "doing okay."  (Tr. 262).  She was reportedly doing better until she fell the previous day with her foot underneath her.  (*Id.*).  Everything "looked okay" following her knee surgery.  (*Id.*).

9

On June 1, 2004, Dr. Miller noted that Walker was about three weeks post-surgery and was doing well, but still complained a lot.  (Tr. 261).  Dr. Miller recommended weight loss and noted that she needed to exercise.  (*Id.*).  He did not think there was much else that could be done at that time.  (*Id.*).

Dr. Samani completed a Medical Impairment Evaluation form prepared by Walker's attorney on June 28, 2004.  (Tr. 242-47).  He indicated that he treated Walker for three years and saw her on a regular basis.  (Tr. 242).  He indicated that Walker's condition caused her to be unable to perform her past job or other similar work.  (*Id.*).  Frequently lifting 20 pounds or more might aggravate her condition.  (Tr. 243).  Her symptoms included knee and foot pain.  (*Id.*).  She would experience pain sufficient to interfere with attention and concentration on a frequent basis.  (*Id.*).

Dr. Samani also completed a Physical Capacities Evaluation form on the same day.  (Tr. 245).  He indicated that Walker could sit for a total of eight hours, stand for two hours, and walk for one hour during a workday.  (*Id.*).  Furthermore, Walker could seldom lift up to 20 pounds; never lift greater than 20 pounds; occasionally carry up to 10 pounds; seldom carry up to 50 pounds; never carry over 50 pounds; frequently use both hands for reaching, grasping, and fine manipulation; occasionally use both feet for foot controls; never bend, squat, crawl, or climb; occasionally reach above shoulder level; never work at unprotected heights; occasionally work around moving machinery; frequently work around exposure to marked changes in temperature and humidity; frequently drive automotive equipment; frequently work around dust, fumes, and gases; occasionally perform work at a rapid pace; frequently perform work at a slow pace; and would need to shift from sitting,

10

standing, or walking at will and other than at a scheduled break every two hours.  (Tr. 245-
46).  Walker did not need to leave a work station or lie down during a work shift.  (Tr. 246).
Dr. Samani also indicated that Walker's maximum workload would be four days per week.
(*Id.*).

The record also contains a consultative psychological examination report dated
June 10, 2003, from Daniel Ullman, Ph.D.  (Tr. 169-71).  Walker presented with a blunted
affect and low energy.  (Tr. 169).  Walker stopped working in February 2003, apparently
because she was calling in sick too much and because she needed to take care of her
children.  (*Id.*).  She had gotten into a conflict with a supervisor about a year earlier and
threw a chair, but did not indicate that this resulted in termination.  (*Id.*).  Walker reported
problems handling her finances due to spending money too quickly and not having enough
left over to pay bills.  (*Id.*).  She primarily complained of "being around people" and claimed
to have a short temper.  (Tr. 170).  Walker also reported an onset of depression about ten
years ago when her sister was murdered.  (*Id.*).  She took Zoloft with limited benefit for
about a year, but had no psychiatric hospitalizations or counseling.  (*Id.*).  She had been
able to work without many conflicts, possibly due to working on her own and on the third
shift.  (*Id.*).  She indicated that she did not have any major conflicts with others until a new
supervisor came on board about two to three years ago.  (*Id.*).

On examination, Walker was alert and adequately able to sustain attention and
concentration.  (*Id.*).  Her speech was adequately fluent and thought content was rational
and organized.  (*Id.*).  Reality testing was good, and there were no indications of perceptual
disturbances or hallucinations.  (*Id.*).  Her affect was blunted throughout the interview.

11

(*Id.*).  Walker reported anhedonia, sleep disturbances, appetite disturbances, and crying spells.  (*Id.*).   She in particular complained of social withdrawal and irritability.  (*Id.*). Remote memory appeared intact, but verbal reasoning was low.  (*Id.*).  She was given a short story for immediate recall, but did not appear to put forth much effort on the task. (*Id.*).  Walker was also resistant to doing some math problems.  (*Id.*).  Walker reported doing grocery shopping and cleaning around the house.  (*Id.*).   She limited her social contacts to family members.  (*Id.*).

Dr. Ullman stated that there was not a restriction of activities of daily living due to a mental illness.  (*Id.*).  There were difficulties maintaining social functioning.  (*Id.*).  Her depression appeared to be continuous and there were no reports of deterioration.  (Tr. 171).  Walker presented with the ability to sustain concentration and attention needed for task completion; and the ability to carry out short and simple instructions under ordinary supervision.  (*Id.*).  It was not clear how she was able to adapt to changes in the workplace. (*Id.*).  Dr. Ullman diagnosed depressive disorder and a current global assessment of functioning (GAF) of 55.[1]  (*Id.*).

In a report dated August 21, 2003, Rafael Tatay, M.D., noted that he saw Walker with some frequency recently for major depressive disorder.  (Tr. 217).  She was not psychotic, was of average intelligence, and had not suffered from any major depressive illness or any other major psychiatric disorder.  (*Id.*).  Dr. Tatay indicated that Walker's ability to do work-related activities was impaired by her physical condition and also by her

---

[1]"GAF" refers to the "Global Assessment of Functioning Scale," a rating of overall psychological functioning.  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

loss of esteem and tendency to get involved in self-defeating situations.  (*Id.*).  Her low confidence was a major contributing factor to these symptoms.  (*Id.*).  With proper treatment including psychotherapy or reinforcement doing her work, she should be able to do better.  (*Id.*).

### THE ALJ'S DECISION

The ALJ found Walker was not "disabled" within the meaning of the Social Security Act.  (Tr. 15).  The ALJ framed the issues as: 1) whether Walker was entitled to disability and SSI benefits under the Act; and 2) whether Walker was "disabled."  (*Id.*).

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920 (2005)[2] to determine whether Walker was disabled, considering:

> any current work activity, the severity of any medically determinable impairment(s), and the individual's residual functional capacity with regard to . . . her ability to perform past relevant work or other work that exists in the regional and national economies.  This latter step requires an assessment of the individual's age, education and past work experience.

(Tr. 23).

Following this analysis, the ALJ found that Walker was not disabled.  (Tr. 24). Specifically, at step one the ALJ found that Walker has not performed any substantial gainful work activity since February 19, 2003.  (Tr. 23).  At step two, the ALJ found Walker's "tear of the posterior horn and medial meniscus and degenerative arthritic changes of the medial and lateral compartment of the right knee, status post right knee patella debridement and arthroscopy, and depressive disorder, not otherwise specified, are considered 'severe' based on the requirements" of the Act's regulations.  (*Id.*).  At step

---

[2]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits.  For simplicity, further references will only be to § 404.1520.

13

three, the ALJ found Walker's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4., known as the "listings." (*Id.*). At step four, the ALJ determined Walker is unable to perform any part of her past relevant work. (*Id.*).

Finally, at step five, the ALJ found: 1) Walker has the residual functional capacity to perform a significant range of light and sedentary work such as an assembler or hand packager; and 2) such jobs exist in significant numbers in the national economy. (Tr. 24). In so deciding, the ALJ weighed Walker's testimony, finding her allegations regarding her limitations were not totally credible. (Tr. 23). The ALJ also carefully considered the medical records submitted by treating physicians Drs. Samani, Bohart, and Miller, and the opinions of consultative physicians, Drs. Wang, Boes and Ullman. (Tr. 15-21).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Eichelberger v. Barnhart,* 390 F.3d 584, 589 (8th Cir. 2004). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence

supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently.  *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000).

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

### SEQUENTIAL EVALUATION

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any

15

other work.  *Id.* § 416.920 (a)(4)(i)-(v).  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is made.  *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding: 1) Walker has not performed any substantial gainful work activity since February 19, 2003; 2) Walker's "tear of the posterior horn and medial meniscus and degenerative arthritic changes of the medial and lateral compartment of the right knee, status post right knee patella debridement and arthroscopy, and depressive disorder, not otherwise specified, are considered 'severe' based on the requirements" of the Act's regulations; 3) Walker's medically determinable impairments do not meet or medically equal one of the "listings;" 4) Walker is unable to perform any part of her past relevant work; and 5) Walker has the residual functional capacity to perform a significant range of light and sedentary work such as an assembler or hand packager, and such jobs exist in significant numbers in the national economy.

## OPINION OF WALKER'S TREATING PSYCHOLOGIST

"The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole.  *Id.* at 1013; *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "The ALJ's function is to resolve

conflicts among 'the various treating and examining physicians.'" *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)).  Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give "good reasons" for that weighting.  *Hogan,* 239 F.3d at 962*; Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Samani, Walker's treating physician, submitted numerous pieces of documentary evidence, summarized above.

In Walker's case, the ALJ discounted Dr. Samani's opinion as follows:

I do not accept Dr. Samani's extreme assessment on June 28, 2004, . . . and his opinion that the claimant could work a maximum of 4 days per week, because it is not supported by the treating records and objective findings. As discussed above, most of the claimant's treatment since January 2004 has been for the right knee.  There were no left foot complaints after the left foot plantar fasciitis release in November 2003.  Although she had significant right knee complaints and the MRI of the right knee on January 19, 2004 showed a suspicious tear of the posterior horn and medial meniscus and degenerative changes, it is not clear how the claimant's right knee conditions would so severely limit the claimant's ability to lift and carry such that she could seldom lift up to only 20 lbs. and occasionally carry 10 lbs.  I note that Dr. Samani stated in the same evaluation form that lifting more than 20 pounds would aggravate the claimant's condition.  That suggests the claimant's condition would not be aggravated by lifting under 20 pounds. However, Dr. Samani finds the claimant could seldom lift up to 10 pounds. Dr. Samani also inconsistently states the claimant could seldom lift up to 10 pounds but occasionally carry up [to] 10 pounds.  These inconsistencies erode the validity of Dr. Samani's assessment.  The claimant also reported in June 2003 that she was able to go back to work. . . .  It appears the claimant was in vocational education. . . .  That indicates greater capacity than assessed by Dr. Samani.  Finally, Dr. Miller, the orthopedic surgeon who performed the right knee patella debridement and arthroscopy in May 2004, did not find the claimant's right knee condition as limiting as Dr. Samani did.

(Tr. 19-20) (citations omitted).

This Court has carefully reviewed the record and agrees with the ALJ's summary of Dr. Samani's opinion.  The opinion contains inconsistencies and differs from other additional medical evidence, including Dr. Samani's own office notes.

The ALJ evaluated Dr. Samani's opinion appropriately.  The ALJ's conclusion that the treating physician's opinion was inconsistent with evidence in the record as a whole is supported by substantial evidence.  *See Dunahoo,* 241 F.3d 1033, 1038 (8th Cir. 2001) (finding that the treating physician's opinion was contradicted by the opinions of four other physicians).

### CREDIBILITY OF WALKER'S TESTIMONY

Walker argues that the ALJ did not properly evaluate her subjective allegations of her physical and mental condition as to her limitations, restrictions, and work-like activity in finding her testimony not credible.  (Filing No. 10 at 10).  The Court notes that the ALJ found Walker's testimony not totally credible regarding Walker's allegations of her limitations. (Tr. 23).  Specifically, the ALJ determined: Walker's subjective complaints and alleged limitations were out of proportion to the objective findings; Walker's subjective complaints and alleged limitations were not consistent with the treatment she received; and Walker made inconsistent statements regarding her limitations.  (Tr. 21).

The credibility of Walker's testimony in its entirety is crucial because, in determining the fourth factor relating to a claimant's residual functional capacity to perform past relevant work, the ALJ must evaluate the credibility of a claimant's testimony regarding subjective pain complaints.  The underlying issue is the severity of the pain.  *Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a

claimant's subjective pain complaints." *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir.

2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,*

28 F.3d 828, 830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective complaints of pain

if inconsistencies are apparent in the evidence as a whole.'"  *Haley v. Massanari,* 258 F.3d

742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected

inconsistencies that discredited the plaintiff's complaints of pain) (quoting *Gray v. Apfel,*

192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining

physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari,* 274

F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results
> from a medically determinable physical or mental impairment, direct medical
> evidence of the cause and effect relationship between the impairment and
> the degree of claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective complaints solely
> because the objective medical evidence does not fully support them.

> The absence of an objective medical basis which supports the degree
> of severity of subjective complaints alleged is just one factor to be
> considered in evaluating the credibility of the testimony and complaints. The
> adjudicator must give full consideration to all of the evidence presented
> relating to subjective complaints, including the claimant's prior work record,
> and observations by third parties and treating and examining physicians
> relating to such matters as:

> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework for determining the credibility of subjective complaints, e.g., pain.

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined the factors before discounting the claimant's testimony. An ALJ is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

The federal regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R. § 416.929. Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b) (2005).

"Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of a [sic] medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests,

electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 416.928©) (2005).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record. Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).[3]

------

[3]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo,* 241 F.3d at 1038 (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Walker's case, the ALJ's decision demonstrates that although he failed to specifically cite the *Polaski* factors, his analysis encompasses the appropriate factors, including: 1) Walker's daily activities; 2) the duration, frequency and intensity of Walker's pain; 3) precipitating and aggravating factors; 4) the dosage, effectiveness and side effects of Walker's medications; and 5) Walker's functional restrictions as reported by Walker and as demonstrated on physical examination. *See Kinealy v. Shalala*, No. 91-1401, 1993 WL 261994, at *3 (8th Cir. July 13, 1993) (concluding substantial evidence supported the ALJ's credibility determination even though the ALJ failed to specifically cite *Polaski*). In his decision, the ALJ discussed Walker's daily activities, noting that Walker testified that her daily activities include: helping her youngest child get ready, doing some housework and cooking, and going grocery shopping. (Tr. 16, 20). The ALJ mentioned that Walker rated her pain as 10/10, and the physical therapist remarked that this seemed to be high as far as her subjective threshold was concerned, and that patients who report 10/10 pain are often exaggerating. (Tr. 17). On the issue of Walker's medications, the ALJ mentioned which medications and treatments Walker had received, including Prozac, Zoloft, and cortisone injections, and their effectiveness. (Tr. 16, 20). The ALJ noted that Walker had not taken aggressive pain medications nor received treatment in a pain management clinic.

(Tr. 21).  Finally, the ALJ discussed at length Walker's reported functional restrictions and compared Walker's account with the results of her physical examinations.  (Tr. 16-21).

The ALJ made an express credibility determination.  First, the ALJ reasoned that Walker's subjective complaints were not fully credible because the subjective complaints and alleged limitations were out of proportion to the objective findings.  (Tr. 21).  The ALJ noted that there was "no evidence of severe disuse muscle atrophy that would be compatible with the level of inactivity and incapacity alleged by [Walker]." (*Id.*).  Next, the ALJ found that Walker's complaints and alleged limitations were not consistent with the treatment she received, and the ALJ articulated the inconsistencies upon which he relied. (*Id.*).  Specifically, the ALJ noted that Walker did not take aggressive pain medications nor receive treatment in a pain management clinic, even though she alleged disabling pain and rated her pain 10/10 on a pain scale.  (*Id*).  The ALJ also mentioned there was no evidence of mental health treatment.  (*Id.*).  Finally, the ALJ determined Walker had made inconsistent statements regarding her limitations.  (*Id.*).  In particular, the ALJ noted that Walker alleged that she suffered from major depression, which caused her to sit in a room by herself and stare at a wall; however, when asked about her daily activities, Walker testified that she helped her youngest child get ready for school, attempted to do household chores, and prepared three meals a day.  (*Id.*).  *See Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (affirming the ALJ's discount of claimant's subjective complaints of pain, where the plaintiff cared for one of his children on a daily basis, drove a car infrequently, and occasionally went grocery shopping).

23

The Court finds that the ALJ considered Walker's subjective pain complaints and alleged limitations, and discredited them to some extent based on the reports of her treating physicians; the reports of consultant physicians; Walker's oral and written statements, and the results of medical tests.  The ALJ's credibility determination that Walker's "allegations regarding her limitations are not totally credible" is proper under *Polaski* and the federal regulations.  *See Scdoris v. Barnhart,* 226 F. Supp. 2d 1183, 1190 (D. Neb. 2002) (finding that the medical evidence did not support a finding of total disability, and the plaintiff was not "entirely credible" with his complaints of disabling pain). The ALJ's credibility determinations are supported by substantial evidence in the record as a whole.

## CONCLUSION

For the reasons stated in this memorandum, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 20th day of March, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge